UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

In re:                                    )
                                          )
    RAYMOND JAMES CORDOVA         )    Case No. 08-10692-SSM
                                          )    Chapter 7
        Debtor                        )

**MEMORANDUM OPINION**

The chapter 7 trustee, Gordon P. Peyton, has objected to the debtor's claimed exemption of a pick-up truck and various power tools as tools of the trade and to the exemption of a jointly-owned minivan as tenancy by the entireties property. Following an evidentiary hearing, the court took the objection under advisement to review the applicable law.[1] For the reasons stated, the court will disallow the exemptions.

Background

Raymond James Cordova ("the debtor") filed a voluntary petition in this court on February 15, 2008, for relief under chapter 7 of the Bankruptcy Code, listing $2.4 million in unsecured debts. On his schedules, he stated that he had been employed for the prior six months as a financial analyst with a public school system, earning $7,198 a month. On his statement of financial affairs, he stated that his only income for calendar year 2008 through the filing of the bankruptcy petition had been from his employment with the school system. For 2007, he reported income of $17,810 from the school system, $32,624 from a general contracting

---

[1] The debtor filed a post-hearing brief which the court has considered.

company called Brothers Construction of Fairfax, Inc.,[2] and $19,456 from "side jobs."  For 2006, he reported income of $90,117, entirely from Brothers Construction.

On his schedules, the debtor claimed exempt, among other property, $1,700 in power tools and $5,399 of the equity in a 2005 Ford F-150 pickup truck[3] under the Virginia exemption for tools of the trade.  He also claimed exempt, under the Bankruptcy Code's exemption for property held as tenants by the entirety, a 2006 Honda Mini Van valued at $17,280.  The trustee filed a timely objection to the exemption of the power tools, the pickup truck, and the minivan.

At the hearing, the debtor (who has an MBA degree) testified that he had been employed by the Fairfax County Public Schools since October 15, 2007, as a budget analyst at a salary of $70,000.00 a year.  He further testified that his current employment contract went until the end of the school year (July 2008).  Prior to accepting that position, he had worked as a contractor for 17 years—most recently for Brothers Construction—but had to look for other employment because of a downturn in the construction business.  He testified that he still did carpentry jobs on the side, working evenings and weekends.  He further testified that the Ford F-150 pickup truck was fitted with a toolbox and was necessary to carry tools and materials to the job sites.  The certificate of title for the minivan shows that the vehicle has no liens and is titled in the name of "CORDOVA, RAYMOND JAMES, AND CORDOVA, MARIBETH, OR SURV."[4]

---

[2] The debtor's schedules and statement of financial affairs reflect that he has an ownership interest in Brothers Construction, but does not state his percentage ownership.

[3] The value of the truck is shown as $15,430, subject to a security interest in favor of Capital One Auto Finance in the amount of $9,813.  Following the hearing on the objection to exemptions, the debtor entered into a reaffirmation agreement with Capital One.

[4] In a post-hearing submission, debtor's counsel states that at the hearing the debtor testified that he was married to Maribeth Cordova at the time the car was purchased.  A transcript of the
(continued...)

2

Discussion

I.

Upon the filing of a bankruptcy petition, all legal and equitable interests of a debtor in property become property of the estate and are therefore potentially available to pay the claims of creditors. § 541(a), Bankruptcy Code. As part of his or her "fresh start," however, an individual debtor may exempt certain assets from the estate and thus retain them, free from the claims of most creditors. § 522(b)(1) and (c), Bankruptcy Code. This includes property that is exempt under state law, and, if state exemptions are claimed, any interest in property held as tenants by the entirety to the extent it is exempt from process under applicable state law. § 522(b)(3)(A) and (B), Bankruptcy Code.

Virginia law allows an exemption of up to $10,000 in value for tools of the trade, including a motor vehicle. Va. Code Ann. § 34-26(7). Additionally, under Virginia law, property held as tenants by the entirety may be reached by joint creditors of both spouses but is not liable for the debts of either spouse alone. *Vasilion v. Vasilion*, 192 Va. 735, 740-43, 66 S.E.2d 599, 602-04 (1951). Accordingly, such property is exempt in bankruptcy from the claims of non-joint creditors, and may be administered by the trustee only for the benefit of joint creditors. *Williams v. Peyton (In re Williams)*, 104 F.3d 688, 690 (4th Cir. 1997); *Sumy v. Schlossberg*, 777 F.2d 921, 927-28 (4th Cir.1985). The issues to be resolved, therefore, are whether the debtor can exempt his pickup truck and carpentry tools as tools of the trade even

---

[4](...continued)
hearing has not been prepared, and the court's own notes do not reflect that testimony. For the purpose of the present ruling, however, the court will assume that counsel's representation is correct.

though his primary source of income on the date he filed the bankruptcy petition was as a budget analyst; and second, whether the minivan is held by the debtor and his wife as tenants by the entirety.

## II. The Tools of the Trade Exemption

Among the property exempt from creditor process under Virginia's poor debtor's exemption, Va. Code Ann. § 34-26, are the following:

> Tools, books, instruments, implements, equipment, and machines, including motor vehicles, vessels, and aircraft, which are necessary for use in the course of the householder's occupation or trade not exceeding $10,000 in value, except that a perfected security interest on such personal property shall have priority over the claim of exemption under this section. A motor vehicle, vessel or aircraft used to commute to and from a place of occupation or trade and not otherwise necessary for use in the course of such occupation or trade shall not be exempt under this subsection. "Occupation," as used in this subdivision, includes enrollment in any public or private elementary, secondary, or vocational school or institution of higher education.

Va. Code Ann. § 34-26(7). The evident purpose of the exemption is "to . . . protect the basic tools and utensils in order to aid the debtor in continuing in his means of livelihood." *In re Quidley*, 39 B.R. 362, 367 (Bankr. E.D. Va. 1984). This court has previously held that the relevant point in time for determining whether an asset is a tool of the trade is the date the bankruptcy petition is filed. *In re Weinstein,* 192 B.R. 133, 137 (Bankr. E.D. Va. 1995).[5] At the same time, "a temporary abatement of work in the trade may not be fatal to the claimed exemption for tools of the trade . . . in the absence of an intentional abandonment of the trade by the debtor." *Id.* (*citing Flick v. Farmers Home Administration*, 47 B.R. 440, 443 (W.D.Pa. 1985),

---

[5] Timing was particularly an issue in *Weinstein*, since the debtor was invoking the exemption not as a shield against the trustee but as a sword against a creditor that held a security interest in the debtor's truck. *See* § 522(f), Bankruptcy Code (allowing debtor to avoid nonpossessory, nonpurchase-money security interests in, among other property, tools of the trade of a debtor).

*quoted with approval in Meadows v. Farmers & Merchants Nat'l Bank (In re Meadows)*, 75 B.R. 357 (W.D.Va. 1987)).  Since it is undisputed that the debtor earned his living primarily, if not exclusively,[6] as a budget analyst, not as a builder, on the date the bankruptcy petition was filed, the question becomes (1) whether a debtor can have more than one trade for the purpose of the Virginia exemption and (2) under what circumstances will a debtor's employment in a different trade or occupation at the time of filing be considered only a temporary cessation of the debtor's prior trade or occupation so as to allow the exemption of the tools used by the debtor in that occupation or trade?

A.

The issue of whether a debtor may have more than one occupation for purpose of the Virginia tools of the trade exemption was addressed by Judge Shelley of this court more than 20 years ago in *In re Samuel* 36 B.R. 312, 314 (Bankr. E.D. Va. 1984).  The debtor in that case was engaged in home construction and remodeling but sought to exempt a workboat used in a crabbing business he operated on the side.  *Id.* at 313.  Judge Shelley expressed the court's belief that "the legislature did not intend that a party could engage in several trades or occupations in order to claim multiple exemptions." *Id.* at 314.  He reasoned that if a debtor was allowed even one additional trade, there would be no basis to deny exemptions for all possible trades a debtor engaged in with the hopes of making a living. *Id.*  Accordingly, he held that "[f]or purposes of the exemption statutes a debtor may claim only one principal occupation." *Id.*

---

[6] The court notes that the debtor's statement of financial affairs, filed under oath, states that he had *no* income from any source other than his job with the school system in the six weeks prior to the filing of the petition.

Other jurisdictions have followed the single principal occupation rule articulated in *Samuel*. For example, in *In re Henry*, 83 B.R. 748, 749 (Bankr. N.D. Tex. 1995), the debtor was a full time employee at Crown Cork & Seal but, shortly before filing his chapter 7 petition, purchased a welder and operated an independent welding business on his days off. About six months before filing his petition, the debtor started working as a welder full time. *Id.* Citing *Samuel*, the *Henry* court held that welding was the debtor's principle occupation because he changed his primary occupation by abandoning working at Crown and taking up welding full time. *Id.* at 750. *Accord In re Cass*, 104 B.R. 382, (Bankr. N.D. Okla. 1989) ("As a rule, claims of exemption of 'tools of a trade' should be limited to the debtor's single principal business."); *In re Meckfessel*, 67 B.R. 277, 278, (Bankr. D. Kans. 1986) ("Where the debtor carries on more than one profession, he/she may only exempt those articles belonging to his/her main or principal business, or to the business in which he/she is primarily engaged.").

It is true that some jurisdictions allow debtors to take a tool of the trade exemption for multiple, simultaneous occupations. Although noting that the single principal occupation limitation is the majority rule, the court in *Matter of Weinbrenner*, 53 B.R. 571 (Bankr. W.D. Wis. 1985) reasoned that present day employment practices make multiple employers, jobs, and trades commonplace and even necessary for some. Accordingly, the court held that "allowing a debtor to claim tools of the trade for every bona fide trade in which he proves intent and ability to engage is the best approach to ensure equal treatment of debtors." *Id. at 577* In *Weinbrenner*, the debtors had engaged in and intended to engage in both farming and machinery repair, and demonstrated reasonable prospects for reentering both. *Id.* The court felt it would be "presumptuous" for the court to select one of the two trades. *Id.* Similarly, a Louisiana

bankruptcy court in *In re Baker*, 71 B.R. 312, 314 (Bankr. W.D. La. 1987), allowed the debtor a tools of the trade exemption for two chain saws and a motor vehicle used in a side job of cutting and selling firewood.  Even though the evidence suggested that the expenses of the side business "might be equal to or possibly in excess of the revenues," the court nevertheless held that under Louisiana law "the trade need not be the debtor's sole trade and . . . need not provide a 'substantial portion' of the debtor's income to constitute a trade or profession sufficient to justify the exemption of its tools." *Id.*

Notwithstanding the existence of some contrary authority, the court finds Judge Shelley's reasoning in *Samuel* persuasive and will follow it.  No Virginia court, and no federal court applying Virginia law, has ever held that a debtor may have more than one trade or occupation for the purpose of exempting tools of the trade.  This court certainly does not rule out the possibility that a unique set of facts might exist would justify a finding of multiple occupations for a particular debtor; but, if so, the second occupation would have to be something more than a side business, which is not the situation here.

Even so, there remains the question of how to determine which is the principal occupation or trade when the debtor is engaged in more than one at the time of the filing of the petition.  In *Samuel*, the court considered the debtor's past experience in the respective trades, the relative financial successes of the respective trades, the time demands of the respective trades, the credibility of the debtor's testimony on the time dedicated to the respective trades,  the debtor's testimony as to the motives for starting the new trade, and what occupation and equipment the debtor listed in the bankruptcy schedules. 36 B.R. at 315.  Prior to 1982, the debtor in *Samuel* had no experience in crabbing but had been in the construction business since

1966. *Id.* In 1982, he reported gross sales of $49,000 for a net income of $13,000 for the construction business and reported gross sales of only $4,500 and a net loss of $4,164 for his crabbing business. *Id.* at 314. Given the disparity in profitability between the two trades, the court did not find the debtor's testimony that he spent ninety percent of his time crabbing to be credible. *Id.* The debtor's testimony that he was starting the crabbing business for his son suggested he did not intend it to be his primary occupation. *Id.* at 315. The court also considered that the debtor listed construction as his occupation on his schedules and did not list the 220 crabpots that he testified at the hearing to owning. *Id.* Judge Shelley did emphasize that his ruling "does not mean that a debtor cannot change occupations and assert exemptions relating to that new occupation," and that "[m]erely because a debtor lacks a history of endeavor in a particular occupation will not in itself cause a debtor to be denied a claimed exemption." *Id.*

In a subsequent case, *In re Allen*, 52 B.R. 206 (Bankr. E.D. Va. 1985), also decided by Judge Shelley, the chapter 7 trustee objected to the debtor's exemption of tools of the trade related to carpentry, claiming that the debtor had abandoned carpentry in order to be a general contractor at the time of the bankruptcy filing. The debtor had been a carpenter all his life but attempted to get into the general contracting business, an effort that was the cause of the bankruptcy. *Id.* at 207-08. The debtor did some carpentry work in his role as a general contractor and immediately returned to full time carpentry upon the demise of his general contracting company. *Id.* In accordance with *Samuel*, the court had to determine which occupation was the debtor's principal occupation and reasoned that in order to find the debtor as a general contractor instead of a carpenter, there must be some evidence that the two trades are "mutually exclusive occupations" and that the debtor had intended to abandoned carpentry for

8

contracting.  *Id.* at 209.  The court held that the debtor's principal occupation was carpentry because carpentry and general contracting were not mutually exclusive and because carpentry was the trade "most relied on by the debtor and the one that the debtor has held onto since being compelled by bankruptcy to abandon the other."  *Id.* at 210.  The court distinguished this case with *Samuel* because crabbing and construction are "totally unrelated."  *Id.* at 209.

The debtors were less successful in *In re Cass*, 104 B.R. 382 (Bankr. N.D. Okla. 1989).  In that case, one of the debtors was a salaried employee at B.F. Goodrich but also operated a stud farm for breeding race horses. He had been in the horse breeding business since 1953 and worked for Goodrich since 1957.  *Id.* at 384.  The debtor's salaried job generated a profit, unlike the horse-breeding business, which continuously incurred huge, up to six-figure, annual losses.  *Id.* at 387.  While noting that profitability alone is not determinative of a debtor's principal occupation, the court felt that it "may be simply unrealistic to treat a regularly unprofitable activity as a 'trade,' especially when a more profitable activity is carried on alongside it."  *Id.*  The court held that the horse-breeding operation was something the debtor carried on regardless of its losses because he liked to do it, likening it to a hobby rather than a trade.  *Id.*

B.

In this case, there is no suggestion that the debtor's work as a carpenter is merely a hobby. Nevertheless, looking solely at the situation as it existed on the filing date, it would be difficult to characterize the trade in which the debtor had not earned a dime in the six weeks prior to the bankruptcy filing—while pulling down a salary of $70,000 a year on an annual basis on his full-time position as a budget analysist—was his principal occupation.  However, the fact that on the date the petition is filed a debtor may earn his or her livelihood from a particular trade

9

or occupation does not necessarily preclude a finding that some other occupation is the debtor's true trade if the debtor's current employment is only temporary and the debtor has not abandoned the prior trade. *In re Johnson*, 19 B.R. 371, 374-75 (Bankr. D. Kan. 1982).

For example, in *In re Aldrich*, 1994 WL 774638 (Bankr. E.D. Va. 1994), a decision by Judge Adams of this court, the debtor operated two photo processing laboratories, which he started in 1977 and 1981 respectively. *Id*. at *1. In 1991, he left the labs on a temporary basis to care for an ailing family member and signed a non-competition agreement with the investors. *Id.* at *1-2. During his leave, the investors took control of the company and terminated the debtor's employment for cause, thereby triggering the non-compete agreement, which prohibited the debtor's involvement in photo processing within fifty miles of the city for two years. *Id.* at *2. At the time of filing the chapter 7 petition, the debtor was unemployed but sought the tools of the trade exemption for photo processing equipment. *Id.* at *2. At the meeting of creditors, the debtor expressed an intention to assist his sons in the operation of their photo processing lab and had started working there ten to twelve hours a day by the time of the hearing. *Id.*  In allowing the tools of the trade exemption, Judge Adams noted that the debtor had been in the photo processing business continuously since 1977 and held, "It is sufficient that [the debtor] had the intention of returning to his occupation as a photo processor at the time of the bankruptcy filing, even though he had been precluded from doing so by the contractual relationship with the objecting creditor." *Id.* at *3.

A different result was reached in *In re Henke* 294 B.R. 105 (Bankr. D. N.D. 2003). In that case, the debtors, who were husband and wife, attempted to use the tools of trade exemption to avoid a creditor's security interest in their farming equipment even though, at the time of

filing, they were not engaged in farming but were employed for third parties as a trucker and a nurse respectively. *Id.* at 106-07.  In determining if the debtors were in a temporary cessation of their principal occupation of farming, the court considered: (1) the intensity of the debtors' past farming activities, (2) the sincerity of their intentions to shortly resume that vocation, and (3) the reasonableness of their prospects to return to farming. *Id.* at 108-09.  The debtors began operating a cattle farm in 1995, which they expanded to a trucking operation to haul cattle. *Id.* at 106.  The trucking segment of the business led to the bankruptcy, which was filed in December of 2002. *Id.*  By February 2003, all of the debtors' cattle had been liquidated, they had not been engaged in farming at the time they filed the bankruptcy petition, and they had not resumed farming as of the April 22, 2003 hearing. *Id.* at 110.  The debtor expressed hopes to buy feed through his trucking employment and hoped to get a loan, possibly from his mother, to make the necessary repairs to the equipment. *Id.*  Although the court accepted that the debtors' farming experience was considerable, the court was not convinced that the debtors had any reasonable prospect of returning to farming, noting that "hopes are not enough." *Id.* at 111 (internal quotation marks omitted).

      Similarly, in *Johnson*, the debtors sought the tools of the trade exemption on "feeder pig" farming equipment.  19 B.R. at 372.  In 1979, the debtors switched from raising "feeder pigs" to "fat hogs," which required more grain, and rising grain prices led to the bankruptcy filing. *Id.* at 373.  Prior to the filing, the debtors surrendered all of their hogs and had no pigs or hogs in inventory at the time of filing. *Id.*  The debtors admitted that they had no cash or credit to buy grain but proposed two "nebulous and indefinite" prospects for getting the financial assistance necessary to reenter pig farming. *Id.* at 375.  The court rejected the tools of the trade exemption

11

because the debtors failed to demonstrate any reasonable prospects for reengaging in pig farming. *Id*.

The same result was reached in *Matter of Clausen*, 81 B.R. 519, 520 (Bankr. S.D. Iowa 1988), the debtors ceased their cattle feeding operation over six years prior to the filing of their bankruptcy petition. The debtors were engaged in farming. but for a third party, and were not using their own equipment. *Id.* At the meeting of creditors, the debtors expressed an intention to return to farming on their own within five to ten years. *Id.* While noting that "great weight should be given to a debtor's statement of intention to resume farming," the court rejected the exemption because at least eleven years would have passed by the time the debtors intended to resume farming on their own and that time period stretched the notion of "temporary cessation" beyond reasonableness. *Id.* at 521-22.

C.

Applying the foregoing principles, the court can only conclude that carpentry was not the debtor's primary trade or occupation on the date he filed his bankruptcy petition. For the six month period leading up to the filing of the petition he had been employed, and primarily earned his living as, a budget analyst. This was not a job, it must be stressed, in which he was was underemployed or working below his education level. He had, after all, an advanced degree that was appropriate to the position. Additionally, the circumstance that led him to undertake that employment—the depressed state of the construction industry in the wake of the financial crisis resulting from the sub-prime mortgage meltdown—cannot with any confidence be seen as merely a temporary phenomenon. It is likely, unfortunately, to continue for an indefinite period of time. Although the debtor testified that his current contract with the school system lasts only

through July 2008, there is no reason to believe that it will not be renewed or that he will not find another position for which his M.B.A. degree qualifies him. But in any event, given that on the filing date of the petition, the debtor had primarily earned his living for some six months as a budget analyst, not as a carpenter, and further given that any return to carpentry as his primary source of income is wholly dependent upon the recovery of the housing market, something that may not occur for many months, and perhaps even years, the court cannot find that the debtor's employment situation on the filing date of the bankruptcy petition constituted only a temporary cessation of his former trade or occupation. For that reason the court will sustain the trustee's objection to the tools of the trade exemption for the power tools and the pickup truck.[7]

### III. The Tenancy by the Entireties Exemption for the Minivan

The minivan, as noted, is titled in the name of the debtor and his wife jointly with right of survivorship. Historically, tenancy by the entirety was a mode of holding title to lands or tenements. Although state and federal courts in Virginia had for many years recognized a tenancy by the entirety in the rents from, or sales proceeds of, real estate held as tenants by the entireties,[8] it was not until 1999 that Virginia, by statute, expressly authorized other types of personal property to be held by married couples as tenants by the entireties. The current text of the statute is as follows:

---

[7] The denial of the tool of the trade exemption is without prejudice to the debtor's right to claim the separate $2,000 motor vehicle exemption available under the Virginia poor debtor's exemption. Va. Code Ann. 34-26(8).

[8] *See, e.g., Moore v. Glotzbach*, 188 F.Supp. 267 (E.D. Va. 1960) (rents); *Oliver v. Givens,* 204 Va. 123, 129 S.E.2d 661 (1963) (proceeds of sale); *Pitts v. United States,* 242 Va. 254, 408 S.E.2d 901 (1991) (promissory notes received as part of purchase price).

> Any husband and wife may own real or personal property as tenants by the entireties. Personal property may be owned as tenants by the entireties whether or not the personal property represents the proceeds of the sale of real property. An intent that the part of the one dying should belong to the other shall be manifest from a designation of a husband and wife as "tenants by the entireties" or "tenants by the entirety."

Va. Code Ann. § 55-20.2.  With respect to motor vehicles, however, a separate statute rather plainly precludes holding title as tenants by the entirety:

> When the Department [of Motor Vehicles] receives an application for a certificate of title for a motor vehicle, trailer, or semitrailer, to be issued in the names of two natural persons, jointly with right of survivorship, the Department shall issue to its owners a certificate of title accordingly. Any certificate issued in the name of two persons may contain an expression such as "or the survivor of them," which shall be deemed sufficient to create joint ownership during the lives of the two owners, and individual ownership in the survivor. . . . Nothing herein shall . . . (ii) *grant immunity from enforcement of any liability of any person owning the vehicle*, as one of two joint owners, to the extent of his interest in the vehicle, during the lives of its owners; (iii) *permit the issuance of a certificate of title in the names of two persons as tenants by the entireties*[.]

Va. Code Ann. § 46.2-622 (emphasis added).

The debtor, however, cites to language in a scholarly opinion by another judge of this court for the proposition that when husband and wife acquire title to property jointly with right of survivorship, a tenancy by the entireties is always created.  *In re Sampath*, 314 B.R. 73 (Bankr. E.D. Va. 2004) (Mayer, J).  *Sampath*, however, dealt with real property, not an automobile.  The property at issue (a condominium unit) had been conveyed to the debtor, his wife, and their daughter "as joint tenants with the common-law right of survivorship," with no recitation in the deed of the marital relationship of the debtor and his wife.  The narrow holding of the case was that no recitation of marital status was required to create a tenancy by the entireties between the debtor and his wife as to their joint interest so long as they were in fact married on the date they acquired title and the conveyance expressly provided for right of

survivorship. *Id.* at 89. Whether the common-law rules that govern the creation of an entireties estate in real property should apply in their full rigor to personal property is an interesting question. At common law, after all, a tenancy by the entireties was an estate in lands, and very different rules governed the personal property of married couples. *Sampath* can be read as holding that under Virginia law, a married couple is precluded from holding title to real property in any form other than a tenancy by the entireties if they take with right of survivorship. *Id.* at 98. However, the Virginia statute authorizing married couples to hold personal property as tenants by the entirety is phrased in the permissive ("may"). But even if the common-law rules applicable to the creation of an entireties estate in lands were extended without modification to personal property, the fact remains that the General Assembly has effectively precluded the creation of a tenancy by the entireties in motor vehicles. As noted, § 46.2-622 of the Code of Virginia, after first authorizing the Department of Motor Vehicles to issue certificates of title either with or without right of survivorship, then expressly states that such titling shall not "*grant immunity from enforcement of any liability of any person owning the vehicle*, as one of two joint owners, to the extent of his interest in the vehicle, during the lives of its owners." The clear import of this language is to make the interest of an individual co-owner liable for his or her individual debts, notwithstanding any right of survivorship in another co-owner. Of course, the principal feature of a tenancy by the entireties is that it immunizes the jointly-owned property from claims of non-joint creditors. But if there were any doubt as to the legislature's intent to prevent that result, it is resolved by the next clause, which expressly states, "Nothing herein shall *. . . permit the issuance of a certificate of title in the names of two persons as tenants by the*

*entireties*[.]" For that reason, the court will sustain the trustee's objection to the exemption of the minivan.[9]

A separate order will be entered consistent with this opinion.

Date: _____         _____
                                    Stephen S. Mitchell
Alexandria, Virginia                United States Bankruptcy Judge

Copies to:

Gregory M. Van Doren, Esq
9119 Church Street
Manassas, VA 20110
Counsel for the debtor

Gordon P. Peyton, Esquire
Redmon, Peyton & Braswell
510 King Street, Suite 301
Alexandria, VA 22314
Chapter 7 trustee

Raymond James Cordova
11696 Sandal Wood Lane
Manassas, VA 20112-3000
Debtor

---

[9] Of course, only the debtor's one-half interest in the minivan is available to pay the claims of creditors. Additionally, although the trustee has the power to sell the interest both of the debtor and his wife in the minivan, such a sale would require the bringing of an adversary proceeding, Fed.R.Bankr.P. 7001; and the wife would be accorded a number of protections. § 363(h) and (k), Bankruptcy Code.